Mr. Justice Cox
delivered the opinion of the Court:
I am requested to announce the opinion of the Court in *387 the case of Harriet A. Ford against the Travellers Insurance Company, Harrison, and others.
It appears that, as far back as 1871, this complainant had a paid up policy for the amount of $2,208 on the life of her husband, Charles E. Ford, issued by the defendant insurance company. In July of that year this policy was transferred by Mrs. Ford to the defendant Harrison, to secure an indebtedness contracted to him by her husband. With that particular indebtedness we have no concern.
Three years afterwards, or about that time, in February, 1874, Dr. Ford contracted a new debt to Harrison of $2,400, which was evidenced by eight promissory notes of $300 each. To secure that debt Dr. Ford and his wife executed a deed of trust upon their domicile, the only real property which they owned. That deed was subject to a prior incumbrance to the amount of $10,500, bearing 10 per cent, interest. At the same time, the plaintiff, Mrs. Ford, alleges in her bill, and the facts clearly show, that it was understood that this policy of insurance, then in the hands of Harrison, should continue as the security for the new loan.
In December, 1874, Dr. Ford and his wife conveyed this house absolutely to Harrison — that is, by absolute deed— and parted with the equity of redemption, Dr. Ford then remaining in the house as tenant at a rent of $100 a month. This state of things continued about seventeen months, when the property was sold to Mrs. Mary Clemmer for $12,000, and then the house was vacated by Dr. Ford and his family.'
Dr. Ford lived about eight years longer, the policy remaining, in the mean time, in the hands of Harrison. After his death, Mrs. Ford claimed the policy, and, her. demand not being acceded to, she filed this bill against Harrison. The decision of the Court below was in favor of the complainant, and from that an appeal was taken to this Court.
The important allegation of the bill is that the indebt-
*388 ' edness of $2,400 from Dr. Ford to the defendant Harrison was paid off by the absolute conveyance made by Ford and his wife to Harrison in December, 1874. On the contrary, the defendant, Harrison, says that these parties were in great financial distress at that time; that they were largely in arrears for the interest on the first incumbrance, and also for taxes and special assessments on this property; that they were threatened with suits by various creditors, and were in danger, as they supposed, of being turned out of their property, and, at their special request, he took a title from them, absolute in form, -but with the distinct understanding that it should still stand as a trust deed to secure the advances that he was compelled to make, to pay interest and taxes on the first incumbrance of $10,500 and for taxes and expenses after that date, and as security for his debt; that such was the whole object of the absolute conveyance, there being no intention whatever to extinguish the indebtedness of $2,400.
The facts and circumstances proven, and the correspondence of the parties, put in evidence, make it clear, to a demonstration, that Harrison’s account of this transaction is correct. Of course the burden of proof is upon the complainant to show that this conveyance was in satisfaction of that debt. Looking at the conveyance itself, we find that it does not recite the satisfaction of this debt, asa consideration. The notes were never surrendered, and, in the next place, Mrs. Ford made a new assignment, as a part of that very transaction, of this policy of insurance on her husband’s life.
This deed is dated December 5, 1874. On the very day before, and clearly as a part of the same transaction, Mrs. Ford makes a new assignment of this life insurance policy. It is sent on to the insurance company, reaching there, of course, after the deed of the house was put on record, and it is clearly a part of the same transaction.
Now how that is consistent with the idea that this $2,400 *389 debt was extinguished by that transaction it is difficult to say. Here is a new recognition of the debt and a new assignment as security. But that is not all. There is correspondence between the parties, put in by thé complainant herself, which is absolutely inconsistent with the idea that this conveyance was a settlement of the indebtedness.
There is a letter from Dr. Ford himself, in which he acknowledges the receipt from Harrison of large sums of money, and shows his application of them, just exactly as Harrison says had been agreed upon, for thé payment of large amounts of arrearages of interest, over $600,1 think, and the payment of a large amount of taxes.. And here are two letters put in, from Harrison to Ford, in one 'of which he tells Dr. Ford of the amount he has assumed by accommodating him in that way, and the annual burden that he has subjected himself to. He shows the interest he will be compelled to pay annually, and that he will be left out of pocket, every year, $600 by this transaction entered into for the relief of complainant and her husband, and asks him to see the first incumbrancer to ascertain if he will not reduce the rate of interest, so that his annual' loss may be reduced to two or three hundred ’dollars instead of $600. In one of the letters, after the conveyance, he' speaks of “our" interest in this property, which is inconsistent with the idea that this conveyance was the satisfaction of that debt. Then, again, there is, on the date of the 11th of December, 1874, a chattel mortgage, made to another person, and apparently to secure another debt, covering the whole personal property that was in that' residence, which exactly corresponds with and corroborates the statement which Harrison makes, to the effect that they were in such pecuniary straits that their object was to cover up their property from the immediate pursuit of creditors, ánd not to extinguish this indebtedness to him. So much for that part of the transaction.
Then, again, a fact relied on as evidence of the satisfac- *390 tion of this debt is, that there was found among the papers of Di\ Ford after his death a certificate from Harrison, to the effect that this deed of trust and the notes secured by it had been fully satisfied, and that was dated the 18th of May, 1876. Of course that paper by itself, would look like an acknowledgment of the satisfaction of this debt. But it would at once strike anybody as a very singular way of evidencing the payment of this debt — a very unusual way. In the first place, the proper way to evidence the payment of a debt when the mortgagor conveys the equity of redemption to the mortgagee, is for the latter to surrender the notes at the same time. This paper is dated seventeen months after this deed was made.
Another remarkable thing is, that immediately afterwards, a deed of release was executed by Harrison, of the deed of trust which he first held on this property. Now, if a mortgagor means to convey the equity of redemption, in satisfaction of his debt, it is a very queer proceeding that the mortgagee should, seventeen months afterwards, release to him the mortgage, when he has no further interest in the property. The explanation is clear. On the 17th of May the property was sold to Mrs. Clemmer, and she found the deed of trust made in favor of Harrison by Dr. Ford, on record, and, of course, that had to be made to appear on record as satisfied. Harrison executed first the acknowledgment or certificate and afterward the deed of release, for the sole purpose of discharging the apparent ■ incumbrance upon the title, so that Mrs. Clemmer could have a clear title. That was the sole object of the execution of this certificate and of the deed of release of his deed of trust, as plainly appears from the correspondence. This circumstance furnishes no evidence whatever that the debt itself had been paid by the absolute deed to him.
Now, then, did the sale to Mrs. Clemmer have any such result? It was agreed, when the absolute deed was made, that Dr. Ford should go into possession and pay $100 a *391 month rent, and that was to pay the interest on the prior incumbrance, taxes, expenses, etc. The interest on this principal incumbrance itself was $1,050 a year; and if there had been no expenses, interest or taxes to be paid there would have been left only $150 out of the rent applicable to the other debt. But there was, in fact, a large arrearage of interest and very heavy expenses and taxes; and the result was, that in the seventeen months during which Dr. Ford lived in the house, the rent paid by him did not cover those items, so that, when the property was sold to Mrs. Clemmer, Harrison, as he says, was out of pocket more than $1,700, and never has received one cent of principal or interest on account of his own debt; and that statement of his is credible, because there is evidence in the correspondence of the large amounts he had paid in interest in arrears, taxes, etc., in addition to the current interest on this prior incumbrance.
In addition to that, I should remark that the notes given by Dr. Ford to Harrison never were called for or surrendered. The only excuse Mrs. Ford gives for not having called for them was that she neglected to do it. On the other hand, Harrison is asked why he never brought suit on those notes, and he replied that Dr. Ford was insolvent; that he held this policy of insurance, and that was the only thing he had to rely on. And he shows that at the date of Ford's death he had this $2,400 of notes (on which not a dollar of interest had been paid for eight years); that he was out of pocket on account of taxes and expenses he had paid, over and above the proceeds he had received from Mrs. Clemmer, and there was due him, on the whole, some $4,000 or $5,000.
But there arises a question of law which is, whether the policy was assignable. That is the only question of law in the case.
It is said that this is a Connecticut contract. It was a Connecticut company which gave this obligation, and the money was payable -at the office of the Company in Hart *392 ford. Therefore it is claimed that the character of the contract must be determined by the law of that State. The statute of that State says:
“Policies of insurance issued on the life of any person, expressed to be for the benefit of a married woman, whether the same be effected by herself or her husband, or by any other person on her behalf, shall inure to her separate use and benefit, and that of her or her husband’s children, if any, as may be expressed in said policies, independently of any other person effecting the same on her behalf, his creditors or representatives; but this section shall not apply to insurances where the annual premium on the policy shall exceed the sum of $150, unless paid from the private property of the wife.”
In the first place, the policy in question is not one of that class provided for by the statute. That section of the statute refers to policies on which there was an annual premium payable. But here was a policy paid up long ago, as far back as 1871 or sooner. It was not, therefore, one of the classes of policies referred to in this law.
In the next place, this statute does not make the policy nonassignable; and, besides, no decision of the courts of Connecticut makes it so. On the contrary, if any opinion is indicated, it is in the other direction. The only Connecticut case cited to us is that of the Connecticut Mutual. Life Insurance Company against Burroughs, in 34 Conneoticut, 305. In that case the policy was issued for the benefit of the wife if she should survive her husband, but if she should die before her husband, then for the benefit of the children. She undertook to make an assignment of the policy, but she died before her husband, and, of course, all interest of hers in the policy ceased, and it became the property of the children; and on that ground the Court denied her relief. The-Court in that case says:
“The claim of the assignee must depend upon the validity of the assignment; for if the assignor, at the time of the *393 assignment, had no assignable interest in the policy, or if she had an assignable interest which was contingent merely, and that interest has been defeated by the happening of her death before that of her husband, it seems quite clear that the assignee has no valid claim to the fund in question.”
Then they refer to a case in New York, interpreting a similar statute of that State — the case of Eadie vs. Slimmon, 26 N. Y., 9 — and comment upon it in the following language:
“ A policy was issued to a married woman on the life of her husband, similar in its provisions to the one now under consideration. The Statute of New York on this subject is-substantially like our own. She assigned the policy during the life-time of her husband, but survived him. In a suit to which she was a party, the Court held that the instrument had no assignable quality. If we are to adopt the doctrine of that case as the law of that State, it conclusively settles the question now before us; for the reasoning of the Court seems to go' so far as to hold that a policy of this description, prior to the decease of the husband, is absolutely and under all circumstances unassignable by the wife. That such should be the law applicable to a policy the premiums on which were paid by the husband certainly seems reasonable and just; while, on the other hand, if the wife paid'the premiums from her own separate estate, it is difficult to suggest a reason why she should not have the same power to assign her interest in the policy that she has to assign any other chose in action belonging to her.”
And I might here remark that if the premiums are paid out of the husband’s estate to the extent that the law allows, so that it becomes her separate estate, as this statute purports to make it, there is no reason why it should not be' assigned. Then they go on to say:
“ But in one respect that case is distinguishable from this. There the contingent interest of the wife became absolute *394 by the death of the husband during her life; here that interest was defeated by her death during the life-time of the husband. This distinction renders it unnecessary for us to determine the principal question involved in that case; for if it be conceded on the one hand that Mrs. Kendall had an assignable interest in the policy in question it must be conceded on the other hand that that interest was a contingent one, and that the contingency upon which it was to become absolute never has happened and never can happen.”
I now refer to the case of Eadie vs. Slimmon, in 26 N. Y., 9. There the question did arise whether a policy issued to the wife in the form described in the Connecticut case— that is: to the wife for life, and if she died before the husband, then to the children (which is not the case in this policy) was assignable. The main question was whether an assignment had been procured by the wife by undue influence, and a long opinion was given on that question. The Court held that it was. In the conclusion of their opinion they say:
“A majority of my brethren” (Judge Smith says, p. 15) “ also think that the policy of insurance was not assignable by Mrs. Eadie. The policy was issued and taken under the Act of 1840, entitled ‘An Act in Respect to the Insurance of Lives for the Benefit of Married Women.’ We think the intent of the statute was to make these policies a security to the family of any married man and a provision for their use and benefit, and that this intent would be defeated if they were held to be assignable by the wife like ordinary choses in action belonging to her in her own right as her separate property.”
Then, upon a motion for a rehearing, Judge Lenio said, (P-17):
“We see no reason to change the opinion which we arrived at at the last term, as to the assignable quality of the instrument. By the common law a person could insure his *395 own. life for any sum for which, he might choose to pay the premium and which the insurers would engage to insure; but if one desired to insure the life of another, he could only insure the interest which he had in such other life. If he undertook to insure a gross sum, and the contract was not susceptible of a construction which would limit the recovery to the actual damages sustained, the contract would be void under the statutes against betting and gaming. This principle the Legislature, by the Act of 1840 (Laws, p. 59), relaxed in respect to insurance as effected by a married woman for any sum which she and the insurance company might see fit to contract for. It was provided that in the case of her surviving her husband the amount payable by the terms of the policy should be payable to her for her own use, free from all claims of the representatives of her husband or of his creditors. There is another feature in the act which shows that it was an enabling and not a declaratory provision. By the general rules of law a policy on the life of one sustaining only a’ domestic relationship to the insured would become inoperative by the death of such insured in the life-time of cestui que vie; or, if it could be considered as existing for any purpose after that event, it would be for the benefit of the personal representatives of the insured; but by this act the contract may be continued in favor of the children of the insured wife after her death. These features distinguish this case from that of an ordinary chose in action belonging to a married woman as her separate estate. The provision is special and peculiar, and looks to a provision for a state of widowhood and for orphan children; and it would be a violation of the spirit of the provision to hold that a wife, insured under this act, could sell or traffic with her policy as though it were realized personal property or an ordinary security for money.”
We observe that great stress in this case was laid on this feature of the provision of the policy which indicates that it was intended as a security to the family, to the chil *396 dren, and not to the personal representatives. And that distinguishes it from the present policy which is not of that description at-all, but simply a naked policy in which the Company undertakes to pay $2,208 to Harriet A. Ford, the wife, or her legal representative.
But, again :■ the decision in question does not undertake to fix upon the contract itself the feature of non-assignability. It simply expresses the policy of the State, as adverse to the assignment of these species of contracts, with a view to the protection of the orphan children upon the decease of their parents.
Another purpose, apparent on the face of the statute, is to put some restriction on the application of the means of the husband to this object. That is essentially local. The State of New York has no sort of interest in restraining husbands or protecting families outside of their jurisdiction; and the reason assigned for the decision would not apply to a contract entered into by parties not residents of that State and whose domestic relations were not under the control of the laws of that State. Therefore, if this were a New York contract, we should hold this opinion as inapplicable to this case.
But the decision of a New York Court does not interpret the Statute of Connecticut, and we are at liberty to give it our own interpretation. There is not, therefore, in our judgment, anything to distinguish this from any other chose of action. Whether it be regarded as a separate estate, in the sense of the Married Woman’s Acts, or in the contemplation of courts of equity, we must conclude that she had a right to assign it. If treated as a common law chose in action, she could assign it with the concurrence of her husband, and the evidence of his concurrence here is ample. It was the joint act of the husband and wife by which the assignment was made.
We think that the bill ought to be dismissed; and the decree, therefore, of the Court below which awarded this money to her must be reversed.